Filed 6/5/15  In re Trevor W. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re TREVOR W., A Person Coming Under the Juvenile Court Law. | B259599 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>STACY M.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK80409) |

APPEAL from an judgment of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Tarkian & Associates and Arezoo Pichvai for Plaintiff and Respondent.

───────────────────

Stacy M. (mother) appeals from the judgment terminating parental rights to her son, Trevor W. Trevor was removed from mother when he was an infant. The proceedings in juvenile court then went on for nearly five years before the court terminated parental rights. On appeal, mother contends the court erred in terminating parental rights because she had maintained regular contact with Trevor and the well-being he gained from their relationship outweighed the benefits of adoption. We disagree and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

1. *2009*

In April 2009, the Department of Children and Family Services (Department) received a referral alleging that mother had threatened to kill Trevor if his maternal grandmother (grandmother) did not babysit him. Trevor was three months old at the time. The Department investigated and interviewed the family. Mother had a history of psychiatric hospitalizations and was undergoing therapy for depression. Grandmother said she had been Trevor's primary caretaker since his birth. Mother agreed to participate in a voluntary "family maintenance case" with the Department, and to see a therapist and psychiatrist.

In October 2009, grandmother reported that mother had refused to care for Trevor and so he was living with grandmother. In December 2009, grandmother called the Department social worker and said mother had become enraged at grandmother and was blocking her from leaving mother's apartment. Mother also got on the phone with the social worker and "scream[ed] profanities" at her. Trevor was in the car outside with a relative during this altercation, and grandmother was eventually able to leave with him.

Later that month, the Department filed a petition alleging that Trevor was at risk of neglect under Welfare and Institutions Code[2] section 300, subdivision (b), due to

---

[1] We take judicial notice of our prior opinion in *In re Trevor W.* (B256525; filed on January 15, 2015) [nonpub. opn.]. (Evid. Code, § 452, subd. (d).)

2

mother's mental and emotional problems.  The court detained Trevor and released him to Whitman W. (father), who had moved into grandmother's home.

2. *2010*

In January 2010, the court sustained the petition and removed Trevor from mother's custody.  The court released Trevor to father on the condition that he continue to reside with grandmother or in another residence approved by the Department.  Mother was granted monitored visits with Trevor and the court ordered that both parents be given family maintenance services.

In March 2010, father and grandmother reported that mother became angry during visits with Trevor and they had asked her to leave.  Mother's therapist did not recommend unmonitored visits for mother as mother was "not yet stable."  In the following three months, father and grandmother reported that mother's visits with Trevor went well.

In July 2010, the court found that mother was in partial compliance with her case plan and ordered the Department to continue to provide her with services.  In August 2010, grandmother evicted father from her house, but Trevor continued to live with her.  In September 2010, mother's case manager reported that her attendance in therapy had been inconsistent and she had failed to keep her appointments with her psychiatrist or take her psychotropic medication.

In October 2010, mother moved in with grandmother and grandmother promised that Trevor's contact with mother would remain monitored.  Mother enrolled full-time in cosmetology school, and by December 2010, grandmother reported that mother's " 'attitude and emotional issues seem[ed] to have improved for now.' "

3. *2011*

In January 2011, grandmother told the Department social worker she had evicted mother from her home.  Grandmother said that the previous day, mother had raised her voice at grandmother while they were in the car and had then grabbed Trevor when she

---

**2**      All further references are to the Welfare and Institutions Code.

got out the car, saying "[h]e's coming with me." Grandmother called the police who helped convince mother to give Trevor back to grandmother. The next day mother yelled at grandmother and took Trevor into her room, in violation of the monitored visitation order. Trevor was upset and cried for grandmother, and eventually grandmother convinced mother to give Trevor to her. Based on these events, grandmother evicted mother and obtained a restraining order against her.

In February 2011, Trevor moved in with father but spent the weekends with grandmother. In May 2011, the court terminated reunification services for mother. Mother continued to visit Trevor and, in October 2011, mother reported that she saw Trevor once a week. In November 2011, mother showed up at Trevor's day care center, cursed at the day care provider, and told Trevor it was his last day of school. Trevor began to cry and the day care provider said she was going to call the police. Mother then left.

3. *2012*

In May 2012, the Department filed a subsequent petition alleging that (1) two weeks earlier father had left Trevor with mother, and father's whereabouts had been unknown since then, and (2) father's abuse of marijuana rendered him incapable of providing regular care and supervision for Trevor. The court ordered Trevor detained from father and placed him with grandmother. The court then sustained the subsequent petition and ordered reunification services for father.

In August 2012, the Department reported that mother continued to have weekly monitored visits with Trevor for two to three hours. Trevor talked with mother during visits and grandmother said he enjoyed visiting with her. In November 2012, the court terminated father's reunification services and set a section 366.26 hearing on the termination of parental rights for March 2013.[3]

---

**3** The section 366.26 hearing was thereafter continued multiple times to allow the Department to complete the adoption home study, to allow mother "more preparation time," and to allow "supplemental report[s]" to be filed.

4

4.      *2013*

In February 2013, grandmother submitted an application to adopt Trevor, who was then four years old.  In March 2013, the Department reported that mother continued to have weekly monitored visitation with Trevor and that there were no "problems or concerns during the visitation."  The Department also noted that Trevor was very bonded to grandmother and was thriving in her home.

In October 2013, mother filed a section 388 petition seeking reinstatement of reunification services.  Mother submitted evidence that she had completed parenting classes and participated in individual counseling.  She argued that Trevor was bonded with her and his best interests would not be served by "further estrangement."  The Department reported that Trevor said he wanted to live with mother and visit his grandmother.  The following month mother withdrew the petition.

5.      *2014*

In February 2014, mother filed another section 388 petition again requesting modification of the court's order that terminated her family reunification services.  She asked the court either to return Trevor to her or, in the alternative, to reinstate reunification services and liberalize her visits to unmonitored "day, overnight and weekends."

In support of the petition, mother filed a declaration in which she stated that she saw Trevor almost every day during monitored visits, and visited him for three to four hours on weekdays and for the whole day on the weekend.  She also stated she had been living with her fiancé and his family for the past two years, and that the home could accommodate Trevor.

Grandmother initially supported mother's petition, but before the hearing she opposed it.  Grandmother said mother had cancelled her wedding, had "started using derogatory language toward her," and "[had] bec[o]me unreasonable again."  She said "[t]he ugly side of old [mother] came back."  Grandmother also expressed concern that mother would "take it out on Trevor and so she want[ed] to protect Trevor by adopting

5

him." Trevor now said "I do not want to move in with my mom and [her fiancé]; I want to stay with [maternal] grandmother."

In April 2014, the court held a hearing on mother's petition. Mother testified that she had visited Trevor every day for the last year or two, but during the last six weeks her visits had decreased due to grandmother's decision to restrict mother's contact with Trevor. The court denied the petition and continued the section 366.26 hearing to August 2014.[4]

In August 2014, the Department reported that mother had visited Trevor six times in the previous six months. Grandmother said mother had asked for more visits but always "at the last minute." The Department recommended that the court allow grandmother to adopt Trevor. The section 366.26 hearing was continued to October for a contested hearing.

The Department reported that in August mother visited Trevor once, and in September she visited three times. At the section 366.26 hearing on October 1, 2014, mother testified regarding her relationship with Trevor. She stated that she had visited Trevor approximately every week since May 2014, and that during those visits, she would "play games" with Trevor, help him with his homework, fix him meals and "if [she's] there before he goes to bed, [] try to help him with taking a bath . . . [and] reading him a bedtime story." Trevor was "always happy to see [her]" and did not want her to leave at the end of visits.

Mother's counsel opposed the termination of parental rights on the ground that mother had regularly visited Trevor and the benefits of their relationship outweighed the benefits of permanency for him. However, the court found that mother's visits had been "sporadic" as "there's a number of visits that mother is claiming that she made that . . . cannot be verified with the caretaker and the social worker or the child." The court further found mother had not "act[ed] as a parent in such a sufficient manner or consistent or sustained manner that it would make sense to maintain this parent/child

---

[4]     Mother appealed and we affirmed the juvenile court's denial of section 388 petition in *In re Trevor W.* (B256525; filed on January 15, 2015) [nonpub. opn.].

relationship." Accordingly, the court terminated parental rights and ordered the Department to prepare for Trevor's adoption. Mother timely appealed.

## *CONTENTIONS*

Mother contends that her parental rights were improperly terminated because she had regularly visited Trevor and the well-being be gained from their relationship outweighed the benefits of adoption.

## *DISCUSSION*

Section 366.26 provides that if a trial court finds, "by a clear and convincing standard, that it is likely [a child subject to dependency jurisdiction] will be adopted, the court shall terminate parental rights and order the child placed for adoption." (Section 366.26, subd. (c)(1).) However, the court need not terminate parental rights if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to . . . [¶] . . . [the parent's having] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship [the 'beneficial relationship exception']." (Section 366.26, subd. (c)(1)(B)(i).) "After [a] parent has failed to reunify [with her child] and the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist. [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574.)

We review the trial court's ruling that the beneficial relationship exception did not apply under the substantial evidence test. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 576.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*Ibid.*)

Under the first requirement of the beneficial relationship exception, the parent must show that she maintained regular visitation and contact with the child. Here, mother contends -- and the Department does not dispute -- that she regularly visited Trevor. However, the record shows that mother's visits during the months before the hearing had become infrequent. The Department reported that mother had visited

Trevor only about once a month between February and August 2014. Although mother testified she had visited Trevor on a weekly basis since May 2014, the juvenile court found that those visits could not be verified and that, in fact, mother's visits had been "sporadic."

In addition, in order for the exception to apply, mother also had to show that she satisfied the second requirement: that Trevor would benefit from continuing the relationship. This prong of the beneficial relationship exception requires the parent prove that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a *substantial, positive* emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.

"Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] . . . [¶] . . . The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. [1] The age of the child, [2] the portion of the child's life spent in the parent's custody, [3] the 'positive' or 'negative' effect of interaction between parent and child, and [4] the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 575-576 (italics added).)

Mother contends that she had a "positive" relationship with Trevor and that the record showed she "attended to [his] physical care and nourishment, comfort, affection, stimulation, companionship and shared experiences." Although mother's relationship with Trevor was positive in some respects and she attended to some of his needs during

8

their visits, this was not sufficient to show that continuation of their relationship would promote Trevor's well-being to such a degree as to outweigh the well-being he would gain in a permanent home with an adoptive parent.

Trevor was three months old when he was removed from mother, and five years old at the time of the section 366.26 hearing. He had spent most of his life living with his grandmother who provided him with stability and taken care of his physical and emotional needs. Mother never progressed beyond monitored visits and did not provide for Trevor's physical needs other than occasionally making food for him and bathing him during visits. Under the limited circumstances of monitored visits that had taken place primarily on a monthly basis during the eight months before the hearing, mother could not have provided any significant contribution to taking care of Trevor's "needs for physical care, nourishment, comfort, affection and stimulation." (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.) Accordingly, substantial evidence supported the court's order terminating parental rights.

### DISPOSITION

The judgment is affirmed.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.[*]

WE CONCUR:

EDMON, P. J.                    ALDRICH, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.